# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00320-CV

**Wendell Gibbs and Richard Proctor, Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT NO. 240,483-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants Wendell Gibbs and Richard Proctor appeal from the trial court's decree terminating their parental rights to their children. This case involves three children: two boys, J.C., who at the time of trial was six years old, and X.U., who was four, and one girl, T.R., who was fifteen months old. Proctor is J.C.'s biological father. Gibbs is the biological father of X.U. and T.R. and raised J.C. as his son from the time J.C. was about a year old. The children's mother is Camelia Gibbs, whose parental rights were also terminated.[1] The Department took custody of the children in December 2009, shortly after T.R. was born with cocaine and benzodiazepine (described as "Valium like drugs") in her system, and Camelia tested positive for cocaine.

The jury found that Proctor's rights should be terminated for at least one of the following grounds: knowingly placing or allowing J.C. to stay in conditions that endangered his

---

[1] Camelia did not appeal from the termination decree.

well-being, engaging in conduct or knowingly placing J.C. with someone who engaged in conduct that endangered J.C.'s well-being, constructively abandoning J.C. for at least six months, or failing to comply with a court order that established conduct necessary to regain custody of J.C. The jury found that Gibbs's parental rights should be terminated for at least one of the following grounds: knowingly placing or allowing the children to remain in conditions that endangered their well-being, engaging in conduct or placing the children with someone who engaged in conduct that endangered the children, or using a controlled substance and failing to complete a substance-abuse program or completing a program but continuing to abuse the controlled substance. The jury also determined that termination of Gibbs's and Proctor's rights was in the children's best interest.

On appeal, Gibbs challenges only the jury's best-interest determination. Proctor challenges the jury's findings of a statutory ground for termination and the best-interest finding. We reverse and remand the cause to the trial court as to Gibbs. We affirm the decree as to Proctor.

**Factual Summary**

Proctor was in federal prison in Georgia at the time of trial, and in a November 2010 letter to his Department caseworker, he said he had been imprisoned for the past six and one-half years. Proctor also had three state convictions in 2003 and 2004, all for cocaine possession. Camelia thought Proctor went to prison before J.C. was born in early 2005 and said she did not "keep up with" him after he went to prison, although she also said she spoke to him "every now and then." She testified that although Proctor never sent money, Proctor's mother stayed in touch, attempted to help Camelia financially, and had developed a relationship with J.C. Camelia testified that she never told Proctor that she had a drug problem or that the children might be removed from her care.

2

Camelia and Gibbs met and started dating when J.C. was about three months old and married in 2005, six or seven months later.[2] Gibbs raised J.C. as if J.C. were his own child, and J.C. calls Gibbs "Daddy." Despite that close relationship, J.C. understands that Proctor, not Gibbs, is his biological father. At the time Gibbs and Camelia met and married, Gibbs was in the military, where he had served since 2001. Gibbs testified that during his service, he twice deployed to Iraq. Camelia testified that Gibbs was deployed for fifteen months, from "2007 to 2008. 2006 to 2007." In June 2009, Gibbs pled guilty to unauthorized use of a motor vehicle and received a sentence of five years deferred adjudication,[3] and in October 2009, he tested positive for cocaine. As a result, his deferred adjudication was revoked and he entered a Substance Abuse Felony Punishment (SAFP) facility in November 2009. He completed the SAFP program in June 2010 and then completed a three-month term in a halfway house after his release.

On December 22, 2009, one or two months after Gibbs entered the SAFP program, T.R. was born with drugs in her system and was placed in a neonatal intensive care unit (NICU) because doctors feared she was suffering from drug withdrawal. However, the hospital soon determined she was doing well and was not showing signs of withdrawal. Camelia was living with Gibbs's family at the time, and X.U. and J.C. were staying with Camelia's father. The Department was concerned about the boys' placement with Camelia's father due to his thirty-year-long criminal history, including charges of drug possession, aggravated assault, and driving while intoxicated, and

---

[2] Camelia testified that at the time of trial, she and Gibbs were separated and divorcing.

[3] In May 2006, Gibbs also pled no contest to assaulting Camelia, although he testified at trial that he merely reacted in self-defense when she bit him while he was sleeping. He successfully completed deferred-adjudication community supervision for that charge.

because when Camelia was thirteen years old, she made an outcry that her father had sexually abused her when she was seven or eight. Camelia, however, testified that the boys were only on vacation with her father when T.R. was born and that they were not with him for a long-term placement. Further, she was not nervous about leaving the boys with him, did not remember accusing him of sexual abuse or being molested by him, and did not know the details of an aggravated-sexual-abuse conviction that resulted in his serving time in prison. Camelia testified that although she never told anyone from the Department Proctor's name when the children were removed from her care, neither did she tell them that J.C.'s last name was Gibbs or that he was Gibbs's biological son; J.C.'s birth certificate does not list a father's name and shows Camelia's maiden name as his last name.

Gibbs testified that during his deployments to Iraq, he was near or involved in roadside explosions multiple times and hurt his head or suffered minor concussions "about three or four times." He also said he learned during his first deployment that Camelia was cheating on him and that he was diagnosed with post-traumatic stress disorder after his second deployment. He had an appointment to have a brain scan to determine whether he was suffering from a traumatic brain injury later in the month, after trial. If he is found to have such an injury, he will receive disability payments from the military, although he admitted that there was no guarantee that the scan would reveal a physical condition that will qualify him for the benefit. Gibbs testified that he started using cocaine with a friend when he returned from his second deployment.

Gibbs was discharged from the military in October of 2010, shortly after his discharge from the halfway house, and left with a "General Discharge under Other than Honorable Conditions for Misconduct." After leaving the military and the halfway house, Gibbs worked odd jobs and looked

4

for work at the Workforce Commission offices several times a week. In early March 2011, he found a regular job working for a company called Pactiv, and he testified that he was still employed there and that his schedule was changing to nights to accommodate his appointments and visitations. At trial, however, he was shown a letter that stated his employment had been terminated two weeks earlier. Gibbs said he was "unaware of it" and testified that he had last worked the Friday before trial, about a week after the letter said he had been terminated. Gibbs was asked whether he had told the Department that he had been fired, and he said:

> I was unaware of that because I talked to my boss every day for long and he—and he informed me when I missed—I didn't have—because my car broke down. I didn't have a ride to work for two days. I had called him. And he told me they was already planning on moving me to the night shift because of my daytime appointments with the VA and with me seeing my children. He said he was already talking about moving me to night shift.

Gibbs plans to continue working and to go to school online through the G.I. Bill to get an Associate's Degree in Business Management so that he can open his own barber shop someday. Gibbs also testified that he plans to reenlist in the military but that because he received an Other-Than-Honorable discharge, he had to wait six months from his October 2010 discharge. Gibbs testified he will be considered non-deployable if he has custody of the children and that when he reenlists, the children will have medical coverage and he will be making a steady income. He has arranged for a family friend to care for the children while he is at work.

Under the terms of his probation, since leaving the halfway house, Gibbs was required to take approximately two drug tests every month, all of which were negative for drug use. Gibbs testified that he would be on probation for between one and two more years. Gibbs said he took

three drug tests for the Department in June and July of 2010 but then missed Department-required tests for about six months because he could not afford them; he testified that he told his caseworker that he did not have a job or money to pay for the tests. He was able to restart taking tests for the Department in December 2010. His first test came back positive for cocaine but the ten other tests he took for the Department between January and March 2011 have all been negative, along with his probation tests since his release from the halfway house and a drug test for work at Pactiv. He said, "I'm done with drugs. It's not worth what it—I put my kids through or what I've been through. My kids don't deserve to be where they're at. And I'd like them to be home with me."

Camelia and Gibbs testified that they had signed a lease together effective April 1, 2011, less than two weeks before trial, thinking that it would be better for the children if they could reconcile. However, Camelia moved out after about a week because she and Gibbs decided that they could not get along with each other. Gibbs testified that he had spoken to his landlord about having Camelia's name removed from the lease, but the landlord told him "it would be a whole bunch of legal issue [sic] she would have to go through to have her name removed off the lease."

Angel Cruzcora, staffing manager for the employment agency that had placed Gibbs at the Pactiv plant, testified that Gibbs was hired on March 1, 2011, and automatically terminated March 29 after two no-shows. Cruzcora said that if an employee does not call at least two hours before his assigned shift, it is considered a "no-show, no-call," and that two such absences result in automatic termination. Cruzcora testified that he told Gibbs he had been terminated but also said that Gibbs had called him the day before, after Gibbs was shown the termination letter during trial, and that Gibbs sounded surprised to learn that he had been terminated. Cruzcora agreed that more

6

than one staffing agency provided employees for Pactiv and although he testified that Gibbs did not work at Pactiv through his agency the week before trial, he admitted it was possible, if unlikely, that Gibbs had worked through another staffing agency.

Department caseworker Jenny Sykes testified that the Department's plan for the three children was for them to be adopted together. They were currently in the same foster home, where they were doing well, but the foster parents are not going to adopt them. She said that it was hard to find adoptive homes for "[l]arger sibling groups" and that the Department had not located a home for these children in its seven to nine months of seeking one.

Sykes testified that Gibbs had complied with all of the Department's requirements while he was in the halfway house, including completing a psychological evaluation and participating in ongoing therapy, and that it was obvious he loved all three children and they loved him. She said Gibbs had made "some progress" and seems "open to working whatever services. It's just timewise, the kids continue to stay in—in the Foster Care System." Sykes did not believe the children should be returned to Gibbs's care because of the instability in his employment, possible instability with his housing situation, and concerns that he might not protect the children from Camelia if necessary. She admitted, however, that Gibbs's current housing was neat, safe, and appropriate for children. She also knew of the arrangements Gibbs had made for childcare.

Sykes testified that if Gibbs's right were not terminated, there was a possibility that the children would continue in the Department's care until Gibbs was able to regain full custody. She also testified that she did not know about Gibbs's clean drug tests through probation until about a month before trial. Sykes agreed that although Gibbs was cooperative, despite being limited in

what he could do on his family service plan while he was in the halfway house, the Department changed its plan from reunification to termination and adoption in September 2010, at approximately the same time Gibbs was completing his term there and before he could establish stability in his housing or employment situations. Sykes said the Department's plan changed because she did not think he would be able to make sufficient progress before the case's original dismissal date, set for December 2010. However, in November, the case was extended for six months, setting a July 2011 dismissal date and April 2011 trial date.

Asked why the Department did not add Proctor to the suit until November 2010, six months before trial, Sykes said that she "overlooked" information in a June 2010 therapist's report that Proctor, not Gibbs, was J.C.'s biological father. Sykes said neither Gibbs nor Camelia told her that Gibbs was not J.C.'s biological father, and as soon as she realized that Proctor was J.C.'s father, she "did a diligent search" and wrote Proctor a letter. Proctor responded within the same month, and Sykes said the Department sought an extension of the case because of Proctor's recent involvement. Proctor told the Department that his mother wanted to take care of J.C., and she began coming to hearings in December 2010 or January 2011. A home study was conducted, and two weeks before trial, Proctor's mother was approved for J.C.'s placement, but because the Department wants to keep the siblings together, it did not place J.C. with her.

The Department developed a service plan for Proctor in December 2010, requiring him to complete a psychological evaluation and a parenting class, services Sykes testified were available in prison. Because the Department does not have contracts out of state, it was Proctor's responsibility to find service providers, and Sykes admitted that Proctor had a short amount of time

8

to find and complete the required services. The Department's final hearing report stated that Proctor had not completed either requirement. As for Proctor's release from prison, in his November 2010 letter, he told Sykes that he would be released in June 2011, but Sykes testified that her research showed Proctor would be eligible for parole review in December 2011. Sykes was asked whether she would be surprised that Proctor was supposed to be released to a halfway house in June, and she said, "I didn't know that, sir."

Psychotherapist Janice Holladay testified that she had worked with Gibbs, Camelia, and the children since the beginning of 2011. She said J.C. and X.U. had "behavioral issues that are outside of the norm of children their age," although not to an extreme degree, and Holladay did not observe such issues with T.R. J.C. could be defiant and oppositional, and Holladay said Gibbs would "appropriately" change his tone or raise his voice when necessary to show J.C. that Gibbs was serious. X.U. had recently increased the frequency of his bed-wetting, which indicated "some level of distress," and was showing some destructive behavior.

Holladay said that when she first began to work with the family, she knew J.C. was not Gibbs's biological child, so she wanted to "observe how he interacted with all the children. And I saw no difference in how he treated all three children. He treated them all as if they were his children." Holladay testified that J.C. and X.U. were both bonded with Gibbs and that all three "responded to him and called him Daddy." She said that although Gibbs was generally soft-spoken and sometimes had difficulty setting limits, he listened to and tried to act on recommendations, had the ability to learn better parenting skills, and currently had "some really adequate parenting skills." Holladay said that to regain custody, Gibbs needed to be free of drugs for at least six months and

9

have a stable job and housing. When asked if Gibbs had achieved those goals, she answered, "At this point in time, yes." She also said that "to the best of [her] knowledge," it seemed that Gibbs had "worked, has taken advantage of the services the Department has provided for him and that he is now in a position to be able to care for his two children and a child that is not his." She thought this was a "very difficult case" and stated that in these cases, she does not "make a recommendation for the rights to be terminated or not. I leave that to the jury to decide." However, she believed that it would negatively affect the children never to see Gibbs again.

Tina Anderson, an occupational therapist who works with J.C. and X.U., testified that when she started seeing them, J.C. was having trouble with certain basic activities, was placing non-food items in his mouth, and had some auditory sensitivity and speech difficulties, and X.U. had "motor planning difficulties," "visual perceptual challenges," and speech difficulties. X.U. has also had a chronic ear infection for some time, and Anderson said his sensory processing disorder could be caused in large part by that. Gibbs attended many of Anderson's sessions with the boys, and T.R. was often brought to the sessions so Anderson could observe Gibbs's interactions with all three children. She said that the children listened well to Gibbs, even in the distracting environment where the sessions were held. She said the boys were likely to be distracted, and Gibbs "was good at using that firm voice, calling the boys, and they responded to him immediately." Anderson testified that Gibbs was good at guiding the children without giving them answers and that he sat and read with the children. Gibbs was "emotionally focused" on the children and responded normally and appropriately to Anderson's suggestions, and the boys "talk with a lot of pride about their family. And they're eager to be rejoined. They—they talk about it often." She was asked whether it might

10

harm the children for them to be cut off from contact with their parents, and she answered, "Yeah. I think because they know them and it's—it's a very difficult thing. I think—yeah. I definitely think it would affect them."

Linda Edwards, the children's foster mother, testified that she and her husband would not adopt the children because they were getting too old to raise young children through high school. The children came to live with Edwards and her husband upon their removal from Camelia's care, and Edwards said the boys hoarded food and were undisciplined. She said that X.U. and J.C. get into physical fights, sometimes over gifts their parents have given them, that X.U. was the more aggressive and jealous of the three children, that the boys cannot be left alone with each other, and that both boys were gentle with T.R. Edwards agreed that young siblings tended to fight with each other but said, "They leave marks on each other. This—this is not good." The children ask about Gibbs "all the time." They do not mention or ask about Camelia. Edwards said J.C. knows that Gibbs is not his biological father but "claims Mr. Gibbs as his father." Edwards said that the children had some problems at the beginning and that they improved with counseling for a while, then relapsed when they started seeing their mother for visitation. Their behavior did not change when they started seeing Gibbs for visitation. Edwards observed the children's visitation with Gibbs occasionally, and she said that he "seemed okay" and that she had never seen anything to make her think he was not capable of parenting the children.

Social worker Linda Malsbary testified that she did a "Psycho/Social evaluation" on Gibbs and started counseling him in August 2010. Malsbary testified that he had always "presented as someone who was very devoted to his children. He was not afraid to express his emotions." She

11

also said he "appeared very open and honest with me throughout my interactions with him." Gibbs told Malsbary that he did not want to reunite with Camelia, and she was concerned when she learned that they had signed a lease together shortly before trial. Based on her conversations with Gibbs, however, she did not believe that Camelia and Gibbs would attempt to live together. She had visited Gibbs's new home, which was spacious, clean, and decorated for the children's return.

Gibbs did not tell Malsbary that he had been fired from Pactiv, and about a week before trial had told her that he was still employed. Malsbary "was very surprised to hear that he lost his job," but did not believe he had lied about his employment, saying, "[F]rom what I understand, he really thought he still had a job on 4/7, when I talked to him." She agreed that Gibbs had blamed his drug abuse on the stress of Camelia's affair and his war experiences and agreed that working, going to school, and raising three children by himself would also be stressors. She thought, however, that Gibbs had learned how to address his PTSD and was participating in therapy, where he had made progress and had "been successful." Gibbs thinks of J.C. as his son and does not feel differently about him than he does the other children, and Malsbary testified that she thought Gibbs was capable of caring for the children and supervising any contact between Camelia and the children. She did not believe that Gibbs's parental rights should be terminated and said, "I think there has to be clear and convincing evidence that he is a fit parent. And currently, he's not using drugs. He's been participating in therapy." Malsbary's only concern was that Gibbs had lost his job, but she did not think there was any reason he was incapable of finding another.

Shannon Bloxham, the children's guardian ad litem, testified that she had had "a lot of contact" with Gibbs, a few conversations with Camelia, and no contact with Proctor, due to his

imprisonment. She first had contact with Gibbs when he transitioned out of the halfway house, lost contact with him for several months because she did not have a contact number for him, and resumed monthly contact in January 2011. Bloxham had visited Gibbs's home to assess its condition and said it was clean, safe, and appropriate. Bloxham testified that Gibbs completed his required parenting class "pretty quickly" after getting out of the halfway house. Bloxham testified that the help provided by the Department has put Gibbs "in the position where he could be an adequate parent. I think there's still some services that he would benefit from if the children were returned to him. They need a lot of structure. He's been kind of out of the picture with—in [the SAFP facility] and—and deployments. So I think there's a transition period that needs to be made and he needs to be in therapy with [Malsbary] and the Occupational Therapy with [Anderson]." Bloxham did not believe Gibbs would be unable to provide for the children, and she said, "I believe it would not be in the children's best interest to terminate his parental rights." She also said that because she thought Gibbs should retain his rights, she did not think it was in the children's best interest for Camelia's or Proctor's rights to be terminated because they could provide Gibbs with financial support. The Department challenged Bloxham about the children's best interest, asking whether it would be better for them to be adopted into a stable home, and Bloxham said, "We don't have a stable home for them right now. They're in foster care. They're in a great home. A wonderful home. But they do not want to adopt these children. . . . And we don't know where they're going to go."

Debbie McKinney, an assistant in Bloxham's office, testified that she visited the children seven times at their foster home. She said J.C. and X.U. "require a great deal of structure," X.U. has "aggressive tendencies," and T.R. was thriving. McKinney believed that Proctor's rights

13

should "definitely" be terminated, saying, "I can't see where he's a viable parent in any regard for these children," but also said, "I can't say one hundred percent that termination is best for the children because it seems—it's almost a lose, lose situation for these kids." As for Gibbs, McKinney did not state whether she thought Gibbs's rights should be terminated but said she had "genuine concerns" that bringing the children into Gibbs's home could be a stressor that could cause him to relapse. She was concerned about Gibbs's fitness as a parent and said she "cannot see these children going home to their parents at this time" because Gibbs was without a job and was working out time-consuming issues with the military. McKinney had never met or observed Gibbs with the children, however, and agreed that Bloxham "was more qualified to make a recommendation" as to his rights.

Arthur Potts, the children's attorney ad litem, did not provide testimony, but he joined in Gibbs's motion for a directed verdict, asserting that the Department had not presented clear and convincing evidence that termination of Gibbs's rights was in the children's best interest. In his closing argument, he said, "If Mr. Gibbs were not in this case," he would argue for termination of Camelia's and Proctor's rights and stated that he agreed with the Department that the evidence showed Proctor and Camelia lacked the ability to be adequate parents. However, he argued, the evidence did not show that it was in the children's best interest for Gibbs's rights to be terminated.[4] Instead, Potts stated, the Department's efforts had been "very successful for Mr. Gibbs" and the evidence showed that Gibbs was "capable of being a good parent" and that it was in the children's best interest for Gibbs to maintain his rights and to be able to work with the Department's services.

---

[4] Potts also joined Gibbs's motion for a directed verdict that argued the Department had presented insufficient evidence that termination of Gibbs's rights was in the children's best interest.

## Standard of Review

A parent's rights to his children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982). When the Department files a termination case, it seeks to sever those rights irrevocably. *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). To justify termination, the Department must prove both that the parent engaged in conduct enumerated as grounds for termination and that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *Williams v. Williams*, 150 S.W.3d 436, 449 (Tex. App.—Austin 2004, pet. denied). Proof of one required element does not relieve the Department of the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex. 1976)). Because the termination of a parent's rights to his children is a drastic remedy of great weight and gravity, the Department must justify termination under the heightened standard of proof of "clear and convincing evidence," a standard more demanding than the preponderance standard usually applied in civil proceedings. *See* Tex. Fam. Code Ann. § 161.001; *Williams*, 150 S.W.3d at 448-49. "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008); *see C.H.*, 89 S.W.3d at 25; *Williams*, 150 S.W.3d at 449. In our review, we "must maintain the respective constitutional roles of juries and appellate courts" and retain appropriate deference "for the factfinder's role." *C.H.,* 89 S.W.3d at 26. Thus, our review "must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *Id.*

In considering the evidence supporting a termination order, we first consider legal sufficiency, viewing all of the evidence in the light most favorable to the fact-finder's determination, assuming that the fact-finder resolved disputed facts in favor of its finding if it would be reasonable to do so, and asking whether the fact-finder "could reasonably form a firm belief or conviction" that the grounds for termination were proven. *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002); *Williams*, 150 S.W.3d at 449. We disregard evidence that a reasonable fact-finder could have disbelieved or found to be incredible but need not disregard all evidence that does not support the findings. *J.F.C.*, 96 S.W.3d at 266; *Williams*, 150 S.W.3d at 449. Instead, we must consider undisputed evidence, including evidence that does not support the findings, and if we determine that no reasonable fact-finder could have formed a firm belief or conviction that the matters on which the Department bore the burden were true, we will conclude that the evidence is legally insufficient, rendering judgment in the parent's favor. *J.F.C.*, 96 S.W.3d at 266; *Williams*, 150 S.W.3d at 449.

If we determine that the evidence is legally sufficient, we turn to factual sufficiency, viewing all of the evidence in a neutral light to determine whether the fact-finder could have reasonably formed a firm belief or conviction about the truth of the Department's allegations. *See J.F.C.*, 96 S.W.3d at 266; *Yonko v. Department of Family & Protective Servs.*, 196 S.W.3d 236, 244 (Tex. App.—Houston [1st Dist.] 2006, no pet.). In other words, evidence is factually insufficient only if "a reasonable factfinder could not have resolved that disputed evidence in favor of its finding" and if "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *J.F.C.*, 96 S.W.3d at 266. Issues related to witness credibility, meaning questions that

16

turn on a witness's appearance or demeanor, are left to the fact-finder's determination as long as its determination is reasonable. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

In reviewing a best-interest determination, we consider: the child's wishes, her emotional and physical needs now and in the future, emotional or physical danger posed to the child now and in the future, the parenting skills of those seeking custody, programs available to assist those seeking custody to promote the child's best interest, plans for the child's future, the stability of the home, any conduct by the parent that might show that the existing parent-child relationship is improper or harmful, and any excuse for that conduct. *Holley*, 544 S.W.2d at 372. The *Holley* factors, while providing guidance, are not exhaustive, nor must all factors be proved for us to affirm a verdict in favor of termination. *C.H.*, 89 S.W.3d at 27. As the *C.H.* court explained:

> The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest . . . . Other cases, however, will present more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice to uphold the jury's finding that termination is required.

*Id.*

**Gibbs**

Gibbs does not contest the sufficiency of the evidence to show statutory grounds for termination. He argues instead that the evidence is legally and factually insufficient to support a finding that termination is in the children's best interest. Bearing in mind the heightened standard of proof borne by the Department and our role in reviewing the sufficiency of the evidence, we will

examine the evidence related to Gibbs and the children's best interest, using the *Holley* factors as a guide. *See Holley*, 544 S.W.2d at 272.

On the issue of best interest, Holladay, the children's psychotherapist, testified that Gibbs had "some really adequate parenting skills," that the children were bonded with and loved him, that they responded well to him and looked forward to their visits with him, and that she rarely had to intervene to teach Gibbs parenting skills. For Gibbs to regain custody, Holladay said he should be drug free, have a job, and have housing, and she believed he had achieved those requirements despite some concerns about his employment instability. She believed the process had worked for Gibbs, who had taken advantage of the services offered by the Department, and agreed when asked whether Gibbs, to the best of her knowledge, was "in a position to be able to care for his two children and a child that is not his." She said that it "would negatively affect" the children if they were not allowed to see Gibbs, although she declined to give a recommendation as to termination, saying that was not her role in these cases.

Anderson, the boys' occupational therapist, testified that it would cause the boys emotional harm if Gibbs's parental rights were terminated and that Gibbs was very good at handling the children. The children's foster mother stated that Gibbs seemed to be a fit parent and that the boys did not show bad behavior in response to visitation with Gibbs. Malsbary, Gibbs's counselor, testified that Gibbs worked hard at therapy, had obtained an appropriate apartment, and was capable of being the children's primary care giver. She testified that Gibbs's rights should not be terminated. Bloxham, the children's guardian ad litem, also testified that Gibbs's rights should not be terminated and that Gibbs had made progress through Department-provided services and would benefit from

18

the family's continuing to work with Malsbary and Anderson. Potts, the children's attorney ad litem, argued that Gibbs's rights should not be terminated and that the evidence showed it was in the children's best interest for him to work Department services to regain custody. The evidence shows that the children, especially the older boys, were very bonded with and attached to Gibbs and wanted to live with him again, and Gibbs was described by multiple witnesses as being good with and attached to the children, responsive and open to criticism, and firm when necessary.

The only witness who testified that the termination of Gibbs's rights would be in the children's best interest was Sykes, who testified that Gibbs was not fit to be a parent because of his employment instability, possible instability with his housing situation, and her fear that he would not protect the children from Camelia if necessary. However, she did not explain the housing instability she mentioned, and the evidence was that both Gibbs and Camelia agreed that their relationship was completely over and that Camelia was involved with another man. Sykes also testified that the Department had initially sought to reunite Gibbs and the children but changed its plan to seek termination and adoption in September 2010, just after Gibbs was released from the halfway house and before Gibbs had the opportunity to establish stability in housing and employment. Sykes explained that the plan changed because she did not think he would be able to make sufficient progress before the case's original December 2010 dismissal date, but in November, the case was extended for six months, setting a July 2011 dismissal date, and Sykes seems not to have considered whether the extra time would have allowed Gibbs to show his stability. Finally, Sykes testified that it was in the children's best interest to terminate Gibbs's and the other parents' rights so that the children could be adopted together, but the testimony was that finding an adoptive home to take all

19

three children was very difficult and there was no evidence that any candidates had been located for adoptive placement. Indeed, Bloxham noted that no prospective adoptive parents had yet been found and that, if the parents' rights were terminated, the children would remain in the foster system indefinitely until an appropriate placement was found.

Although the children are quite young, several witnesses testified that they love Gibbs and that the boys have expressed a desire to live with him and speak of him and their family with pride. The boys have some issues that are outside the normal range, but not excessively severe, and the testimony was that the Department could continue offering services to the children if Gibbs retained his parental rights. Various witnesses, many of whom are trained to help children therapeutically, testified that Gibbs was very good with the children, handled them well, even when they were being difficult, responded well to recommendations about his parenting, and had a good relationship with them. There was also testimony that Gibbs had substantially complied with the Department's requirements, had made good use of the services offered by the Department, and would continue to improve with further education and resources. Sykes testified that it was possible that the Department could stay involved with Gibbs if he retained his parental rights, continuing to offer services to improve his parenting abilities and support as he regains stability in his employment. Gibbs had a relatively short history of drug use, apparently beginning after he returned from the second of two deployments to Iraq, where he was involved in and injured in several explosions. And, although the witnesses agreed that Gibbs's past drug use was dangerous to the children, the evidence showed that except for one positive test in December 2010, Gibbs had tested negative for drugs about every two weeks since at least September 2010 and was committed to

remaining drug-free in order to take care of the children. The evidence related to Gibbs's housing was that it was clean and appropriate for children, and the only apparent instability in his life was his employment situation. It was unclear whether he was still working at Pactiv, staffed on a night shift through a different agency, or whether he would have to seek a new job or could reenlist in the near future. As for the circumstances that led to the children's removal from Camelia's care, Gibbs was in the SAFP program at the time, and there was no evidence he knew Camelia was using drugs while pregnant or had a history of drug use. Finally, the Department's plan for the children was to place them together in an adoptive home, but the witnesses agreed that no such home had been found in several months of looking and that such homes were hard to find for larger sibling groups.

When we view the evidence in the light most favorable to the jury's determination, the record shows that the children were removed from Camelia's care at a time when Gibbs was incarcerated in the SAFP program due to his drug use, that he missed a number of Department-ordered drug tests while the case was pending, and that he continues to have apparent instability in his employment. On this record, we cannot conclude that no reasonable fact-finder could have formed a firm belief or conviction that it was in the children's best interest to terminate Gibbs's parental rights. *See J.F.C.*, 96 S.W.3d at 266. We therefore hold that the evidence is legally sufficient to support the jury's finding as to best interest. *See id.*

We next consider the factual sufficiency of the evidence, bearing in mind the precious nature of a parent's rights to his children, *see Santosky*, 455 U.S. at 758-59, the clear-and-convincing standard, and all of the evidence, including evidence that weighs against the jury's finding, *see J.F.C.*, 96 S.W.3d at 266. When we view all of the evidence in a neutral light, the overwhelming

21

weight of the evidence, largely presented by experts who worked with Gibbs and the children, is that the children will be harmed if Gibbs's rights are terminated and that he has the capability of being an appropriate, competent parent. The only best-interest evidence to the contrary was offered by Sykes, a Department caseworker, and was premised on the argument that termination would give the children stability through an adoptive home. However, at the time of trial, no such home had been secured, such a home would be difficult to find, and potential placements for the near future had not materialized. And, although "the Department need not prove definitive plans for the child's placement," we also must keep in mind the "strong presumption that the best interest of a child is served by keeping custody in the natural parent." *In re J.N.*, 301 S.W.3d 429, 435 (Tex. App.—Amarillo 2009, pet. denied) (citing *In re D.T.*, 34 S.W.3d 625, 641 (Tex. App.—Fort Worth 2000, pet. denied)).

We recognize that we must give due deference to the jury's factual determinations. *See C.H.*, 89 S.W.3d at 26. However, the overwhelming weight of the evidence, mostly through uncontroverted testimony by objective, uninterested expert witnesses, was that it is in the children's best interest for Gibbs to maintain his rights to them. The only evidence to the contrary was Sykes's testimony that a permanent adoptive home, the likes of which had not been located, would be preferable. Under the elevated clear-and-convincing standard of review, when we consider the balance of the evidence, we can only conclude that the evidence is factually insufficient to support the jury's best-interest determination as to Gibbs. *See Yonko*, 196 S.W.3d at 244-49 (addressing *Holley* factors and holding, "the State presented scant evidence the trial court could credit as to Yonko's future inability to meet the needs of the child under the *Holley* factors so as to overcome

22

the caseworker's assessment of the emotional risk to the child"); *see also J.F.C.*, 96 S.W.3d at 266-67 (if appellate court determines evidence is factually insufficient, it should "detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding").[5]

**Proctor**

As for Proctor, he complains that the evidence is insufficient to support the jury's findings of statutory grounds for termination and of best interest. The jury found that termination was appropriate because Proctor: knowingly placed or allowed J.C. to remain in conditions that endangered his physical or emotional well-being; engaged in conduct or placed J.C. with someone who engaged in conduct that endangered his well-being; constructively abandoned J.C. in the Department's custody for at least six months while the Department made reasonable efforts to return J.C., but Proctor had not maintained significant contact with him and had demonstrated an inability to provide a safe environment; or failed to comply with a court order establishing actions necessary to obtain J.C.'s return. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (O).

---

[5] *See also In re J.N.*, 301 S.W.3d 429, 434-35 (Tex. App.—Amarillo 2009, pet. denied) ("[W]e can see no compelling benefit that would be gained by severing the bond that exists between Bradford and the child at this time, especially in light of the Department's current plans to attempt to place the child with her biological father. . . . As the evidence establishes that Bradford poses no threat to the child during supervised visits and since the Department's goal of providing the child stability and permanence through adoption cannot currently be accomplished, we cannot see how the finder of fact could form a firm belief or conviction that the drastic act of termination would be in the best interest of the child." (citations omitted)); *In re C.E.K.*, 214 S.W.3d 492, 503-04 (Tex. App.—Dallas 2006, no pet.) (mother exhibited poor parenting in past and CASA volunteer criticized mother's behavior, but record showed mother had "done everything that CPS has required of her and more," had made progress and improvements, and cared for children; "The best interest standard does not permit termination merely because a child might be better off living elsewhere."); *Williams v. Williams*, 150 S.W.3d 436, 451-52 (Tex. App.—Austin 2004, pet. denied) (only evidence as to best interest was petitioner's testimony that termination and adoption was in child's best interest).

Proctor was not notified of the Department's involvement with the children or given a family service plan until approximately six months before trial, he was expected to obtain his own services while imprisoned out of state, and it would have been difficult for him to comply with the Department's plan. However, Proctor did not present any evidence that he had made any effort to comply with the plan, and Sykes's testimony and the Department's final report state that he had not met the requirements placed on him. *See id.* § 161.001(1)(O) (failure to comply with court order). Further, Proctor did not present any evidence that he had contacted J.C. at all during the time he was in the Department's care or, indeed, that he had ever had written or spoken to J.C. during his imprisonment. *See id.* § 161.001(1)(N) (abandonment without maintaining "significant contact"). There is no evidence that Proctor has any means to provide J.C. with a safe and stable environment, and no evidence of when Proctor would actually be released or what his plans were upon his release. *See id.* (failure to demonstrate ability to provide child with safe environment).

Finally, Proctor has been imprisoned for J.C.'s entire life and has been unable to care for J.C. Although incarceration alone does not support an inference that the parent's conduct endangered the child, it can show a pattern of conduct that had the effect of endangering the child's well-being. *See Trevino v. Texas Dep't of Protective & Regulatory Servs.*, 893 S.W.2d 243, 247 (Tex. App.—Austin 1995, no writ) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 534 (Tex. 1987)). Proctor had been imprisoned in a federal prison in a different state for J.C.'s entire life, and in his letter to Sykes, he said he had not spoken to Camelia in about eight months. Before being sent to federal prison, Proctor was convicted three times of state charges of drug possession and was sentenced to time in the Texas Department of Criminal Justice and to state jail.

Thus, Proctor's conduct shows a pattern that led to him leaving J.C. in Camelia's care and to Proctor having so little contact with the family that he did not know about J.C.'s removal. *See id.* The only evidence related to Proctor's involvement in or knowledge about J.C.'s life was that Camelia spoke to him "once in a while" and that his mother attempted to have some amount of contact with J.C. However, neither he nor, apparently, his mother, knew that Camelia was using drugs or that J.C. and the other children had been removed from her care.

On this record, the evidence is legally and factually sufficient to support termination for placing J.C. in a situation that endangered his well-being or with a person who endangered his well-being, constructively abandoning J.C. in the Department's custody, and failing to comply with a court order. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (O).

Similarly, as for whether termination of Proctor's rights is in J.C.'s best interest, the evidence shows a history of drug possession and criminal conduct that led to Proctor being imprisoned for the entirety of J.C.'s life. The record also shows Proctor had almost no knowledge about J.C.'s life and very little contact with him. J.C. is aware that Proctor is his biological father and apparently has some kind of relationship with Proctor's mother, but there was no evidence of the nature or depth of that relationship, and Proctor's mother was apparently not involved enough to know of J.C.'s removal from Camelia's care. Further, although two witnesses testified that Proctor's rights should be preserved if Gibbs's rights were not terminated, the reason for those opinions was that Proctor could then be required to provide financial support to Gibbs. There was no evidence that could support a conclusion that Proctor is in or soon will be in any position to care for J.C., of Proctor's plans upon his release from prison, the details of which were uncertain, or that

25

he has the parenting skills or ability to be a competent parent upon his release. We conclude that the evidence is legally and factually sufficient to support the jury's finding that it is in J.C.'s best interest for Proctor's rights to be terminated.

### Conclusion

We affirm the termination decree as to Proctor. As for Gibbs, however, the evidence is factually insufficient to support a finding that termination of his rights is in the children's best interest. We therefore reverse the decree and remand the cause for further proceedings related to Gibbs.

_____

David Puryear, Justice

Before Justices Puryear, Henson and Goodwin

Affirmed in Part; Reversed and Remanded in Part

Filed:   July 19, 2012